UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCES LORRAINE INMAN HERNANDEZ,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>Defendant. | No. 1:19-cv-01298-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF** |

### I.     Introduction

Plaintiff Frances Hernandez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits and supplemental security income pursuant to Titles II and XVI, respectively, of the Social Security Act. The matter is before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1] *See* Docs. 19, 20, and 21. After reviewing the record the Court finds that substantial evidence and applicable law support the ALJ's decision. Accordingly, Plaintiff's appeal is denied.

### II.     Procedural Background

On December 17, 2015 Plaintiff filed an application for disability insurance benefits and supplemental security income claiming disability beginning March 24, 2015. AR 216–24. Plaintiff claimed depression, bipolar disorder, mood swings, memory loss, agitation, lack of motivation, insomnia, anxiety attacks, inborn tricuspid valve leakage, heart palpitations, fluctuating blood pressure, previous heart surgery, limited mobility, back and neck problems, three herniated discs, Ebstein's anomaly, and congestive heart failure. AR 239. The Commissioner denied the application initially on April 26, 2016, and on reconsideration on July 26, 2016. AR 136, 145.

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 6 and 8.

1

Plaintiff requested a hearing on September 21, 2016. AR 152–53. Administrative Law Judge Sharon L. Madsen (the "ALJ") presided over an administrative hearing held on June 28, 2018.[2] AR 39–67. Claimant was represented by counsel at the hearing. AR 39. On September 28, 2018, the ALJ issued a decision denying Plaintiff's application. AR 17–38.

The Appeals Council denied review on July 17, 2019. AR 1–5. On September 17, 2019, Plaintiff filed a complaint in this Court. Doc. 1.

### III.     Factual Background

#### A.     Plaintiff's Testimony

Plaintiff testified at the administrative hearing on June 28, 2019. Plaintiff (born November 7, 1972) lived with her two children. AR 44. Plaintiff's highest level of education was high school, with some college education and a medical assistant certificate. AR 44. She did not require assistance showering or dressing. AR 44–45. She did some household activities including dishes and vacuuming. AR 45. She grocery shopped (though it was uncomfortable) and attended church. AR 45. On a typical day she fed her children, took them to school, and came home. AR 45–46. She had to sit and ice different parts of her body throughout the day to alleviate pain in her back, knee, shin, and neck. AR 46. Her employment history the previous fifteen years included work as a nanny, work for the City of Fresno Parks and Recreation Department's after school program, marketing for B&D Quality Water, and self-employment selling products on eBay. AR 47–48.

She had a leaky tricuspid valve causing symptoms of palpitations and chest pain, which were exacerbated whenever she was wound up or overly extended. AR 49. She did not use stairs. AR 49. Her condition made her tired and foggy. AR 50. Her condition was being monitored and she was awaiting a potential additional surgery. AR 50. She took aspirin and blood pressure medication. AR 50. She experienced constant back pain (both dull and stabbing) down the back of her leg, the onset of which would require her to cease activity and apply ice. AR 51. She took several medications for the pain which took the edge off. AR 51. She was scheduled to receive an injection for her back pain but was unable to complete it due to an anxiety attack. AR 52. Chiropractic treatment provided some relief, but the treatment was discontinued. AR 52. She

---

[2] The hearing transcript incorrectly states that the hearing was held on June 28, *2019*.

experienced constant neck pain in varying degrees of severity stemming from a hump or curvature in her spine, for which she took tramadol and ibuprofen.  AR 53.  She experienced left knee pain relating to a torn meniscus, popped cyst, and pulled tendons.  AR 53.  Her knee pain prevented her from bending over and required elevation three to four times a day.  AR 53.  She underwent right shoulder surgery following a car accident which fixed her shoulder, though she still has atrophy, mobility limitations, and clicking in her shoulder.  AR 54.

She had sleep apnea and used a CPAP machine nightly.  AR 55.  She would wake up tired, clouded, and forgetful.  AR 55.  She had shin splints bothering her for months, causing pain upon walking that would stop her in her tracks.  AR 55.  She believed she could lift and carry ten pounds, stand for thirty to forty minutes, sit for twenty-five to thirty minutes before standing, and walk for twenty minutes before stopping.  AR 56.  She could not lift her right arm above her head to reach a shelf but could do so with her left arm.  AR 56.  She could handle chores around the house in ten-minute increments separated by ten to fifteen minutes of icing.  AR 57.

With respect to her mental health, she felt overwhelmed, confused, and agitated.  AR 58.  She experienced sleep problems and appetite problems.  AR 58.  Every seven to nine days she experienced fatigue so severe she could barely care for herself and required a family member to come over and care for the kids.  AR 58.  She attributed this fatigue to her bipolar disorder.  AR 58.  She could concentrate on something for three to four minutes before she was off track and experienced racing thoughts.  AR 59.  She could handle her own finances, including paying bills and budgeting.  AR 59.  She had difficulty getting along with others without experiencing irritation.  AR 60.  Being in a rush or running late triggered anxiety, mania, and resulted in her being rude to others and retreating from social interactions.  AR 60.  She took lamotrigine, Wellbutrin, Vraylar, Trileptal, and zolpidem (Ambien).  AR 60–61.  The medication helped somewhat.  AR 61.  She went through a lot of medication changes which caused her emotional difficulties and vomiting.  AR 61.

She had numbness in her right hand (her dominant hand) which comes and goes, but overall it did not bother her as much as it used to.  AR 62.  She could write for five minutes before her hands would cramp up, requiring her to stop for another five to ten minutes.  AR 63.

**B.     Medical Records**

**1.     Physical Health[3]**

On April 17, 2015, Plaintiff visited Dr. Mohmand at Clinica Sierra Vista for low back pain after picking up her child. AR 381. Physical examination revealed mild low back tenderness, and an x-ray of the lumbar spine revealed multilevel degenerative change and nonspecific calcification on the lateral and right side of the spine. AR 384, 456. An April 28, 2015 examination with Plaintiff's primary care physician, Dr. Jablonsky, revealed tenderness of the lumbar spine, and Plaintiff was prescribed ibuprofen, tramadol, and baclofen. AR 368–72. A May 20, 2015 CT scan showed multilevel disc disease, worse at L4-5 and L5-S1, neural foraminal stenosis at several levels, horseshoe kidney, and degenerative changes of the lumbar spine. AR 457–58. A July 17, 2015 MRI showed, among other things, mild disc height loss, stenosis, and mild facet atropathy. AR 459–60.

July 24, 2015 x-rays of the cervical spine revealed mild disc degenerative changes. AR 464. Plaintiff visited Dr. Gonzalez for neck and back pain on August 31, 2015 (AR 354) and a cervical spine x-ray found mild reversal of the lordotic curve and minimal anterior endplate osteophyte at C4-C5 and C5-C6 levels. AR 465. An October 29, 2015 musculoskeletal examination was normal, and Dr. Jablonsky referred Plaintiff for a pain management evaluation. AR 346–51. Plaintiff underwent a physical therapy evaluation on December 4, 2015 for lumbago with sciatica and cervicalgia. AR 562. Although Plaintiff reported improvement in pain levels, functional testing found difficulty with deep squat, sitting and lifting light objects, mobility deficit in the thoracic spine, neck weakness, and trapezius weakness. AR 562–63. After nine physical therapy appointments, a February 26, 2016 evaluation found no functional improvement though the assessment did note good tolerance to resistance with exercises. AR 538–61.

On April 18, 2016, non-examining state agency medical consultant Dr. Bugg reviewed

---

[3] Plaintiff's first claim of error centers around the ALJ's formulation of Plaintiff's physical RFC with reference only to opinions of non-examining agency medical consultants Dr. Bugg and Dr. Bobba, opinions which did not cover medical evidence after February 2016, including: 1) Plaintiff's chiropractic care and associated clinical findings under the treatment of Dr. Magallanes beginning March 21, 2016 (AR 735), 2) Plaintiff's limitations related to her knee impairment, as evidenced by a September 2017 MRI (AR 665–66), and 3) Plaintiff's limitations related to her plantar fasciitis, as confirmed by x-rays in October 2017 (AR 924–29). Accordingly, the factual summary as to Plaintiff's physical health will focus primarily on these three impairments.

4

Plaintiff's records through February 2016 and opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, could stand, walk and sit for six hours in an eight-hour work day, and could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. AR 94–95. On July 20, 2016, non-examining state agency medical consultant Dr. Bobba also reviewed Plaintiff's records through February 2016 and offered the same opinion as Dr. Bugg. AR 111–12.

February and November 2016 physical examinations noted cervical and lumbar spine tenderness with painful range of motion. AR 636–37, 835–36. A March 12, 2016 MRI of the cervical spine found mild degenerative changes. AR 667. Plaintiff underwent chiropractic care, pain management and physical therapy throughout 2016. Plaintiff was initially evaluated for pain management at LAGS in February 2016, and a physical examination found abnormal and painful range of motion in the lumbar spine. AR 526–27. Straight leg raising in the supine position was positive on the right and negative on the left, and was negative bilaterally in the sitting position. AR 526–27. Plaintiff was assessed with lumbar spondylosis, herniated disc, lumbar and cervical radiculopathy, and chronic pain syndrome. AR 527. March 16, 2016 and April 15, 2016 examinations noted similar findings, though Plaintiff denied joint stiffness, sciatica, gait abnormality, loss of strength, tingling or numbness, and reported that she could clean, cook, bathe, dress, and drive. AR 573–76, 599–602. A May 18, 2016 physical examination noted similar findings. AR 594–97.

On March 21, 2016, Plaintiff visited a chiropractor, Dr. Magallanes, and a physical exam noted restricted cervical spine range of motion, among other clinical findings. AR 739. Dr. Magallanes assessed subluxation of the cervical, thoracic, and lumbar vertebra. AR 729–40. At follow-up visits with Dr. Magallanes through March 2018, Plaintiff consistently rated her pain a 3/10 in the cervical, thoracic, and lumbar spine. *See, e.g.*, AR 747, 751, 754, 758, 762, 807, 826, 840.

A September 11, 2017 left knee MRI showed, inter alia, medial meniscus tear, MCL sprain, trace patellar tendinosis, popliteus myotendinous junction fluid propagation, leaking/ruptured popliteal cyst, low signal soft tissue and anterior soft tissue edema, and trace edema within the

proximal lateral gastrocnemius muscle belly fibers.  AR 666.

On October 9, 2017, Plaintiff went to urgent care experiencing foot and knee pain.  AR 670.  Examination revealed tenderness at the sole of the left foot and the left knee, she was prescribed naproxen for pain and plantar fascial fibromatosis.  AR 670.  Plaintiff treated with Dr. Banka on October 24, 2017 for foot, knee and back pain, who prescribed ice, supportive shoes and ibuprofen.  AR 924, 929.  An x-ray of the left foot revealed moderate plantar calcaneal osteophyte and tiny dorsal calcaneal osteophyte, with mild degenerative changes in the toes and soft tissue swelling over the lateral foot, though no fracture or malalignment was found.  AR 976.  On February 23, 2018, Dr. Jablonsky diagnosed Plaintiff with plantar fasciitis, refilled medications, and recommended heel support and supportive shoes.  AR 950–55.

After experiencing left knee pain following a dancing event, Plaintiff visited Dr. Shantharam on March 5, 2018, who observed limited range of motion, tenderness in the joint line, crepitation, and positive McMurray sign.  AR 1159–62.  Although an x-ray showed no specific abnormality, Dr. Shanharam assessed internal derangement with arthritis and possible meniscus tear based on MRI findings.  AR 1162.

### 2. **Mental Health**

In January 2015, Plaintiff began treatment for bipolar disorder with Dr. House.  AR 487.  Plaintiff reported symptoms such as irritability, agitation, mood swings, anger, frustration, and sleep difficulties, though mental status examinations generally noted no latent or pressured speech, logical and linear thought processes, intact associations, no hallucinations or delusions, good judgment, full orientation, intact memory, attention, concentration, and language.  *See, e.g.*, AR 487–99.  She was prescribed Paxil, trazodone, Lamictal, and Seroquel.  *Id.*

On April 10, 2016, Dr. Lewis completed a consultative psychiatric evaluation, noting normal mental status and a diagnosis of "other specified depressive disorder, by history."  AR 587–90.  When asked why she applied for benefits, Plaintiff mentioned her physical impairments, but not her mental impairments.  AR 586.  Plaintiff reported activities such as prepping her children for school, dish washing, laundry, cooking, vacuuming, and shopping every couple of weeks, scrap booking, attending church, paying bills, and independent self-care.  AR 590.  Dr. Lewis opined

Plaintiff did not exhibit any symptoms that would impair her functioning. AR 590–91.

In December 2016, Plaintiff began psychotherapy with Blanca Alvarez, LMFT. AR 1039. On May 23, 2018, LMFT Alvarez completed a mental residual functional capacity questionnaire. AR 1168–72. LMFT Alvarez opined that Plaintiff would likely miss work five or more days per month, would be unable to complete full workdays for five or more days per month, that Plaintiff's work efficiency on a sustained basis would be less than 50%, that Plaintiff struggles with emotional and functional abilities approximately 75% of the time based on her mental status. AR 1171. Accordingly, she concluded that Plaintiff was unable to obtain and retain work in a competitive work setting on a full-time basis for a continuous period of at least six months. AR 1171.

At a March 2017 visit with Laura Slippy, FNP, Plaintiff reported some optimism and positive medication response to Vraylar, though she still had noise in her head. AR 1151. At a May 2017 psychiatric visit, Plaintiff noted decreased anger and impulsivity, but some periodic anxiety flares. AR 1146. Psychiatric examination revealed, inter alia, pressured speech, irritable mood and affect, and Plaintiff was prescribed doxepin. AR 1143–44.

During August and November 2017 psychiatric treatment visits with RN Sue Harrington-Howard, Plaintiff reported some emotional symptoms, but her mental status was generally normal and she reported she could redirect herself when feeling manic. AR 1131–39. Plaintiff's doxepin was discontinued and she was prescribed zolpidem. AR 1139.

Plaintiff presented again for treatment with RN Harrington-Howard in February and March 2018 with depression, mania, and anxiety, and objective findings noted, inter alia, fast/loud/pressured speech, impaired insight and judgment, distractibility, and irritable mood. AR 1119–25. RN Howard adjusted medications accordingly and recommended further treatment. AR 1119–25.

### C.     **Vocational Expert**

Vocational expert Kenneth P. Ferra testified at the administrative hearing on June 28, 2018. The ALJ questioned Mr. Ferra regarding a hypothetical individual of Plaintiff's age, education and work history who could perform work at the light exertional level. AR 64. Mr. Ferra testified that

such an individual could perform Plaintiff's past relevant work as a childcare worker and telephone solicitor. AR 64. If a condition was added that the individual had to change position hourly, past work would be precluded (perhaps with the exception of self-employment selling eBay products). AR 65. If a condition was added that the individual could perform only simple, routine tasks, past work would be precluded though the individual would be able to perform other work in the national economy, namely: cleaner, mail clerk, and packing-line worker. AR 65. If a condition was added that the individual needed an additional two to four breaks of 30 minutes per day, no work would be available. AR 65. Finally, if a condition was added that the individual would miss three days a month, no work would be available. AR 66.

## IV.     **Standard of Review, Generally**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision

for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI. The ALJ's Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity after her alleged disability onset date of March 24, 2015. AR 23. At step two, the ALJ found that Plaintiff had the following severe impairments: morbid obesity; lumbar degenerative disc disease;

9

cervical degenerative joint disease; left knee degenerative joint disease and meniscal tear; history of Ebstein's anomaly; status post remote cardiac surgeries; left shoulder degenerative joint disease; left plantar fasciitis; and bipolar disorder. AR 23. The ALJ also found that Plaintiff had the following non-severe impairments: hypertension, hyperlipidemia, asthma, mild obstructive sleep apnea, anemia, fatty liver, and gastro-esophageal reflux disease (GERD). AR 23. At step three, the ALJ considered the applicability of several listed impairments which were most nearly applicable to Plaintiff (including listing 1.02 (major joint dysfunction), 1.04 (spine disorder resulting in nerve root compromise), 4.00 (cardiovascular system), 4.06 (symptomatic congenital heart disease), and 12.04 (depressive, bipolar and related disorders)), but concluded that Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926). AR 24.

Prior to step four, the ALJ evaluated Plaintiff's residual functional capacity (RFC), and concluded that Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(c), and 416.967(c), including lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing, walking, and sitting for six to eight hours in an eight-hour work day, with certain postural limitations (e.g. stooping, crouching), and only routine tasks with occasional public interaction. AR 24.

At step four, considering Plaintiff's RFC, the ALJ concluded (based on the vocational expert's testimony) that Plaintiff could not perform her past relevant work as a child monitor, childcare worker, or marketing telephone solicitor. AR 31–32. At step five, considering Plaintiff's RFC, the ALJ concluded that Plaintiff could perform other jobs existing in significant numbers in the national economy, namely: 1) cleaner, 2) mail clerk, and 3) packing line worker. AR 32–33. Accordingly, the ALJ concluded that Plaintiff was not disabled as defined in the Act. AR 33.

### VII. Issues Presented

Plaintiff asserts two claims of error. First, Plaintiff takes issue with the fact that the ALJ formulated her physical RFC with reference only to opinions of non-examining state agency physicians Dr. Bugg and Dr. Bobba, opinions which did not cover medical evidence post-dating

February 2016, including: 1) Plaintiff's chiropractic care and associated clinical findings under the treatment of Dr. Magallanes beginning March 21, 2016 (AR 735), 2) Plaintiff's limitations related to her knee impairment, as evidenced by a September 2017 MRI (AR 665–66), and 3) Plaintiff's limitations related to her plantar fasciitis, as confirmed by x-rays in October 2017 (AR 924–29). Accordingly, Plaintiff contends that the RFC is legally deficient insofar as no medical professional assessed the impact of all of Plaintiff's diagnoses and symptoms on her functionality. Plaintiff contends that the ALJ was obligated to further develop the record and obtain a qualified medical opinion on the limiting effect of those diagnoses and symptoms, rather than reaching her own conclusions on the matter, which the ALJ is not qualified to do. Second, Plaintiff argues that the ALJ erred by improperly discounting the opinion of Plaintiff's treating therapist, Blanca Alvarez, LMFT, without proper analysis or explanation. Plaintiff's two claims of error will be addressed in turn.

### A. Formulation of the RFC based on the opinions of state agency physicians Dr. Bugg and Dr. Bobba

#### 1. Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so, the ALJ must

determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

The ALJ has a duty to further develop the record where the evidence is ambiguous or the ALJ finds that the record is inadequate to allow for proper evaluation of the evidence. *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001); *Tonapetyan*, 242 F.3d at 1150. A specific finding of ambiguity or inadequacy in the record is not required to trigger the necessity to further develop the record where the record itself establishes the ambiguity or inadequacy. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011); *Garcia v. Comm'r of Soc. Sec.*, No. 1:19-CV-00545-SAB, 2020 WL 1904826, at *13 (E.D. Cal. Apr. 17, 2020).

### 2. <u>Analysis</u>

Here, the ALJ was not required to obtain updated medical opinions in light of post-February 2016 treatment records concerning Plaintiff's back, knee, and foot impairments, where there is little evidence suggesting the RFC would have changed along with the existence of substantial evidence suggesting the opposite.

Plaintiff appears to misread the case law by arguing that the mere existence of medical evidence post-dating the last medical opinion in the record automatically triggers the ALJ's duty to

further develop the record with a revised medical opinion. This is not the case. The ALJ's duty to further develop the record is triggered where the record is ambiguous or incomplete. *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *Tonapetyan*, 242 F.3d at 1150; *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011). Plaintiff identifies no authority affirmatively holding that the existence of records post-dating the last medical opinion necessarily creates ambiguity as to functionality. Nor does Plaintiff identify authority holding that an ALJ necessarily "plays doctor" where she formulates an RFC without a medical opinion translating every medical file in the record into layman's terms. Although there certainly are instances in which medical developments are of sufficient significance to call into question the accuracy of earlier dated medical opinions regarding functionality, likewise there are instances where such medical developments are not sufficiently significant to call this into question.

Plaintiff relies heavily on *Molina*, in which this Court found that the ALJ erred in adopting the functional limitations set forth by a state agency medical consultant whose opinion predated significant medical developments. Br. at 14–15 (citing *Molina v. Berryhill*, No. 2:17-CV-01991 CKD, 2018 WL 6421287, at *4 (E.D. Cal. Dec. 6, 2018)). In *Molina*, the Plaintiff fell, injured her knee, and underwent meniscal repair surgery in December 2013. *Id.* at *3. In February 2014, the consultative physician noted that the plaintiff's surgery recovery appeared to be proceeding well and opined that she could perform light work. *Id.* Three months later the plaintiff was assaulted at work, reinjuring her knee and injuring her neck and shoulder. *Id.* This Court found that "the ALJ's duty to further develop the record was triggered, warranting a consultative examination by a physician who had access to plaintiff's medical records through the May 2014 incident and its aftermath." *Id.*

Here, by contrast, there is no evidence that Plaintiff's back condition worsened after Dr.

Bugg and Dr. Bobba reviewed her records and rendered an opinion on her functionality.[4] Rather, she underwent further treatment of an already non-disabling back condition,[5] ostensibly with an eye toward further improving her back condition. And, to that end, she reported that the chiropractic treatment did result in some improvement (albeit temporary) and she consistently reported her pain as a 3 out of 10 during that treatment period. *See, e.g.*, AR 747, 751, 754, 758, 762, 807, 826, 840. Plaintiff offers no analysis of the chiropractic treatment records but merely refers to the records and unspecified "associated clinical findings" as evidence of "escalating care," a contention which is unsubstantiated.

Plaintiff also argues that the ALJ was required to obtain an updated medical opinion on "Plaintiff's limitations related to her left knee impairment, as evidence by a September 2017 MRI revealing significant clinical findings," and "symptoms and limitations related to Plaintiff's plantar fasciitis, which was confirmed by x-rays in October 2017." Br. at 15 (citing AR 665–66; 924–29). Plaintiff's left knee and foot impairments did not exist at the time Dr. Bugg and Dr. Bobba rendered their opinion, which differentiates those impairments from the records concerning Plaintiff's back impairment. Nevertheless, the record is devoid of evidence supporting the notion that these impairments sufficiently limited Plaintiff's functionality so as to preclude light work.

In June 2017, Plaintiff visited Dr. Jablonsky with knee pain, and he ordered an MRI. AR

---

[4] This also distinguishes the case at bar from *Stevenson* (cited by Plaintiff), in which this Court held that the ALJ erred in adopting the functionality opinion of a non-examining state agency physician, an opinion which pre-dated "plaintiff's treating records regarding *the progression of his spinal impairments*, which were *developed* after the date of Dr. Pancho's opinion." *Stevenson v. Colvin*, No. 2:15-CV-0463-CKD, 2015 WL 6502198, at *4 (E.D. Cal. Oct. 27, 2015) (emphasis added). Similarly, *Goodwin* (cited by Plaintiff), is distinguishable on the same basis. In *Goodwin*, this Court found that the ALJ erred in adopting the functionality opinion of state agency medical consultants over the plaintiff's treating physician regarding her spine impairment where the state agency consultants' opinions were rendered before "plaintiff sustained a fall in November 2014" and before "an April 2015 MRI of the lumbar spine [which] showed L1 compression deformity with *worsened kyphosis* . . ." *Goodman v. Berryhill*, No. 2:17-CV-01228 CKD, 2019 WL 79016, at *5 (E.D. Cal. Jan. 2, 2019) (emphasis added).

[5] Dr. Bugg and Dr. Bobba did review Plaintiff's treatment records for her back impairment (lumbar degenerative disc disease; cervical degenerative joint disease) through February 2016, and opined that Plaintiff could perform light work, opinions that the ALJ incorporated into her RFC. Plaintiff does not dispute that her pre-chiropractic treatment records are consistent with the ALJ's conclusion that she can perform light work.

907–15. The MRI revealed, inter alia, MCL sprain and meniscus tear. AR 666. She visited urgent care in October 2017 with knee and foot pain and was prescribed naproxen. AR 670. She treated with Dr. Banka two weeks later for the same issues, x-ray results revealed calcaneal osteophytes and degenerative changes, and she was prescribed ibuprofen. AR 929, 976. She then visited Dr. Jablonsky on February 23, 2018, who diagnosed plantar fasciitis and recommended heel support and supportive shoes. On March 5, 2018, Plaintiff visited Dr. Shantharam for orthopedic evaluation, who diagnosed internal derangement with arthritis and possible meniscus tear and discussed surgery as a treatment option. AR 1162. Plaintiff chose not to proceed with surgery after consulting with her cardiologist. AR 1157. The orthopedic surgeon's notes reflect that "she has chosen not to have any surgery at this time as she does not seem to have that much of an issue . . ." AR 1157.

Despite seemingly significant diagnoses after foot and knee imaging, there is no indication that Plaintiff received any treatment beyond ibuprofen, naproxen, and recommendation for heel support and supportive shoes[6] from the time when she initially reported pain in July 2017 to the date of her orthopedic evaluation in March 2018. Nor does Plaintiff identify any evidence that, having declined to proceed with surgery, Plaintiff underwent non-surgical treatment of any kind thereafter.

Finally, Plaintiff identifies no treatment notes, treating source opinion,[7] or other source of evidence supporting the notion that her knee and foot impairment were sufficiently debilitating to

---

[6] Although the discussion of the new medical evidence in *Molina* was limited, the opinion does reveal that the Plaintiff was prescribed a cane after her injury which is, at a minimum, a non-trivial distinction from the case at bar, in which Plaintiff identifies no comparable clinical evidence of functional limitations. *Molina v. Berryhill*, No. 2:17-CV-01991 CKD, 2018 WL 6421287, at *4 (E.D. Cal. Dec. 6, 2018) ("Plaintiff points out that Dr. Crowhurst's review predated . . . her June 2014 examination by a worker's compensation physician, Dr. Cohen, who diagnosed left neck sprain and right knee sprain, *and prescribed a cane*.") (emphasis added). And, as discussed above, the plaintiff in *Molina* had previously undergone meniscal repair surgery and re-injured her knee following an attack at work. These facts, coupled with a cane prescription are, on the whole, far more suggestive of functional limitations than the case at bar. Plaintiff identifies no comparable evidence requiring the ALJ to obtain a revised medical opinion on functionality. *Molina* does not support Plaintiff's contention that her knee MRI results (or foot imaging results) were, in and of themselves, sufficient to trigger the ALJ's obligation to further develop the record.

[7] This distinguishes the case at bar from *Shipp* (cited by Plaintiff), in which the court found that, in formulating the RFC, the ALJ inappropriately relied on her own lay interpretation of the medical evidence in reaching a conclusion inconsistent with the limitations set forth in the opinion of the plaintiff's treating physician. *Shipp v. Colvin*, No. CV 13-9468 JC, 2014 WL 4829035, at *7 (C.D. Cal. Sept. 26, 2014). Here, by contrast, there is no countervailing opinion of a treating physician (or any physician) suggesting limitations greater than those found by the ALJ.

preclude her from performing light work with postural restrictions. Indeed, the only other relevant evidence identified by Plaintiff was her brief testimony concerning her knee pain which she testified prevented her from bending at certain angles, needed to be kept as straight as possible, and required elevation three to four times a day.[8]  AR 53.

The Court finds therefore that given the limited nature of the evidence supporting functional limitations, the ALJ had no obligation to further develop the record to rule out the possibility that a revised consultative opinion would result in further reductions to Plaintiff's RFC. Rather, Plaintiff simply did not meet her burden of proof on this point. *See Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005) ("The claimant carries the initial burden of proving a disability.") (citation omitted); *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability" because the "claimant bears the burden of proving that an impairment is disabling"); *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.").

### B. Rejecting the Opinion of Plaintiff's Therapist, Blanca Alvarez, LMFT

#### 1. Applicable Law

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), *as amended* (Apr. 9, 1996). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the

---

[8] The ALJ added postural limitations to the RFC (only occasional stooping, crouching, kneeling), limitations which are not inconsistent with the Plaintiff's testimony concerning her knee impairment.

16

opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

Therapists are not evaluated as if they were physicians. Instead, therapists are considered to be "other" sources. 20 C.F.R. § 404.1513(d)(1). Unlike the opinions of physicians, the opinions of therapists are not entitled to special weight. An ALJ may reject the opinions of "other" sources, such as therapists, by giving "reasons germane to each witness for doing so." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012), *superseded by regulation on other grounds*; *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010). Factors used to evaluate the opinions of "other" medical sources include: (1) examining relationship; (2) length of treatment relationship and frequency of examination; (3) supportability of opinion; (4) consistency with the record; (5) specialization; and (6) other factors supporting or contradicting the opinion. 20 C.F.R. § 404.1527 (c) and (f)(1).

### 2. **Analysis**

Plaintiff contends that the ALJ did not provide sufficient reasons for discounting the opinion of her therapist, Blanca Alvarez, who opined that Plaintiff would likely miss work five or more days per month and that she was unable to obtain and retain work in a competitive work setting on a full-time basis for a continuous period of at least six months due to her mental condition. AR 1171.

The ALJ rejected this opinion because she found it was "over-restrictive and was generally inconsistent with the medical record and overall evidence, including the claimant's daily activities." AR 31. The ALJ summarized the April 10, 2016 examination and opinion of consultative psychiatric examiner, Dr. Mary Lewis, who opined that Plaintiff did not exhibit any symptoms that would impair her functioning and assessed no work-related mental limits. AR 30 (citing AR 590–91). The ALJ noted that, when Dr. Lewis asked her why she applied for benefits, Plaintiff identified her back condition (not her mental condition) as the reason. The ALJ summarized what Plaintiff reported to Dr. Lewis regarding daily activities such as prepping her children for school, dish washing, laundry, cooking, vacuuming, shopping every couple of weeks, scrap booking, attending

church, paying bills, and independent self-care. AR 30 (citing AR 590). In Plaintiff's words, "she had to do everything." *Id.*

The starkly contrasting opinion of Dr. Lewis (who assessed no work-related limits at all) and the extensive daily activities reported by Plaintiff were sufficiently germane reasons to discount LMFT Alvarez's opinion that Plaintiff's mental condition completely precluded her from sustaining gainful employment. The ALJ summarized this evidence in detail thereafter characterizing LMFT Alvarez's opinion as "over-restrictive and . . . generally inconsistent with the medical record and overall evidence, including the claimant's daily activities." AR 31.

In the same paragraph where she reached this conclusion, it certainly would not have been overly burdensome for the ALJ to re-identify one or more daily activity from the litany of extensive daily activities she summarized in the previous page, or to reidentify the opinion of Dr. Lewis, both of which were facially sufficient reasons to have discounted LMFT Alvarez's contrasting opinion. In this case the Court does not find the ALJ's explanation so deficient as to warrant remand given: 1) the facially apparent disparity between Dr. Lewis's opinion, Plaintiff's self-reported activities, and LMFT Alvarez's opinion; 2) the fact that the ALJ's extensive factual summary of this information was separated from her conclusion by less than one page; and, 3) the comparably lower standard for discounting opinions of "other" medical sources, such as therapists, which is less demanding than the standard for discounting opinions of physicians, as set forth above.

Moreover, in addition to being inconsistent with other evidence in the record, the mental residual capacity questionnaire completed by LMFT Alvarez is also internally inconsistent in multiple respects. The questionnaire called for the reviewer to rate various items of mental ability on a spectrum from category I (does not preclude performance of any aspect of the job), to category IV (precludes performance for 15% or more of an 8-hour workday). AR 1168, 1170. As to the 20 types of mental abilities, LMFT Alvarez checked the box corresponding to category I (does not preclude performance of any aspect of the job) for 10 out of 20 abilities and checked the box for category II (5% performance preclusion) for 9 out of 20 mental abilities. AR 1168, 1170. Most notably, she checked the box corresponding to category I (no performance preclusion) for Plaintiff's mental ability to "complete a normal workday and workweek without interruptions from


psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods." AR 1168, 1170 (emphasis added). Thus, LMFT Alvarez's item by item ratings of Plaintiff's mental abilities across 20 categories appears fundamentally inconsistent with LMFT Alvarez's overall conclusion that Plaintiff's mental condition would require absence from work five or more days per month and would preclude her from sustaining any gainful employment.[9]

### VIII. Conclusion and Order

Based on the foregoing, the Court finds that substantial evidence and applicable law support the ALJ's conclusion that Plaintiff is not disabled. Accordingly, Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is denied. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Frances Hernandez.

IT IS SO ORDERED.

Dated: __November 12, 2020__          __/s/ Gary S. Austin__
                                        UNITED STATES MAGISTRATE JUDGE

---

[9] Two additional inconsistencies are apparent. LMFT Alvarez rated Plaintiff's ability to carry out *simple* instructions as a category II (5% performance preclusion) while rating Plaintiff's ability to carry out *detailed* instructions as a category I (no performance preclusion). AR 1168. Secondly, although she rated Plaintiff's ability to *carry out* detailed instructions as a category I (no performance preclusion), she rated Plaintiffs ability to *understand and remember* detailed instructions as a category II (5% performance preclusion). Thus, confusingly, LMFT Alvarez's opinion reflects that Plaintiff could carry out detailed instructions better than she could carry out simple instructions, and that Plaintiff could carry out detailed instructions better than she could understand and remember detailed instructions. *Id.*

19